(March 24, 1987)

■ DELVORINE COOPER et al., Petitioners, v JOHN WILEY et al., Respondents.—In this proceeding commenced pursuant to CPLR article 78 and transferred to this court by order of the Supreme Court, New York County (Louis Grossman, J.), entered March 25, 1986, seeking to annul the determination of the New York State Department of Social Services, rendered July 26, 1985 after a hearing held pursuant to law, which denied petitioners' request to expunge from the central register of child abuse and maltreatment reports an indicated report of child maltreatment of which petitioners are the subjects, the petition is granted, the determination annulled, and the report expunged, without costs.

Petitioners are the subjects of an indicated report of child maltreatment entered in the State-wide central register of child abuse and maltreatment reports maintained by respondent New York State Department of Social Services *(see generally,* Social Services Law, tit 6, § 411 *et seq.,* especially § 412 [11] defining an "indicated report" as "a report made pursuant to this title if an investigation determines that some credible evidence of the alleged abuse or maltreatment exists"). Pursuant to Social Services Law § 422 (8), petitioners demanded a fair hearing to determine whether the report should be expunged from the central register. The hearing resulted in a determination to deny expungement, and the instant article 78 proceeding ensued.

The basis of the report was petitioners' refusal to consent to a blood transfusion for their eight-month-old son at a time

when he was ill with thrombocytopenia, a condition character-ized by a lack of blood platelets and a falling hematocrit level, or blood count. Petitioners, Jehovah's Witnesses, have reli-gious objections to blood transfusions. Their consent was sought by medical personnel at the hospital to which they brought their child and their refusal to consent was reported to the central register by hospital administrative personnel as a case of suspected child abuse or maltreatment *(see,* Social Services Law §§ 413 [requiring certain health care profession-als, among others, to report instances of child abuse or mal-treatment which they have "reasonable cause to suspect"], 420 [making a willful failure to do so a misdemeanor]). The report from the hospital, as recorded by personnel with the central register, was marked "urgent", and stated that the child's blood count was at a level of 21 and falling, that the "danger point is 16", and that the parents, Jehovah's Witnesses, "at this point have not refused medical treatment but have refuse *[sic]* a blood transfusion." The report was relayed to the local child protective service, the New York City Human Resources Administration, Department of Social Services, Special Ser-vices for Children, for investigation *(see,* Social Services Law § 422 [2] [a], [b]).

Special Services assigned a caseworker who, after interview-ing petitioners and hospital personnel, promptly reported that petitioners' refusal *to* consent *to* a blood transfusion was grounded in religious conviction unmixed with any medical considerations, and that they would refuse such consent "un-der any circumstances". The caseworker also reported that petitioners were advised that the child could be taken into "protective custody *if imminant [sic]* danger (medically) exists when hemocrit *[sic]* reaches '17' ". A neglect petition seeking a transfer of custody from petitioners to the Commissioner of the Department of Social Services was immediately filed by Special Services with the Family Court, the child's blood count at the time being at the level of 19, but the petition was withdrawn when the child responded to medical treatment that did not entail a blood transfusion. Several months later, after the child had recovered, Special Services determined that the report was indicated as a case of child maltreatment.

The only evidence in the record ascribable to a physician is a "To whom it may concern" letter signed by one of the attending physicians at the hospital describing the child's then blood count of 19 as a "severe anemia", and stating that the condition would be "life-threatening" should the blood count reach the level of 16 and that a "blood transfusion is

mandatory at hematocrit levels of 16 or below and will be performed."

Indicated reports of child maltreatment must be supported by some credible evidence that the act or acts that gave rise to the report were in fact committed by the subjects thereof, usually the parents of the child (Social Services Law § 412 [4], [11]; § 422 [8] [b] [2]). In the case of medical maltreatment, this requires some credible evidence that the parents did not provide the child with "adequate" medical care, adequacy being defined in terms of resulting impairment to the child's health or an imminent danger thereof (Social Services Law § 412 [2] [a]; Family Ct Act § 1012 [f] [i] [A]). Ultimately, the question of whether a child is being deprived of adequate medical care, and is thus a maltreated child within the meaning of the statute, depends upon whether the parents have provided an acceptable course of medical treatment for the child in light of all the surrounding circumstances *(Matter of Hofbauer,* 47 NY2d 648, 656). It is well settled that a parent's religious objection to blood transfusions is not a circumstance that bars the State, as *parens patriae,* from intervening to ensure that a necessary blood transfusion is administered *(Matter of Sampson,* 29 NY2d 900, 901, *affg* 37 AD2d 668).

The evidence adduced at the fair hearing was to the effect that, from a medical standpoint, a blood transfusion was not mandatory until the blood count had fallen to the level of 16. Since the child's blood count never fell below 19, a blood transfusion never became necessary; therefore, it cannot be said that the child's condition was impaired for lack of adequate medical care.

What is less clear is whether it can be said that the child's condition was in imminent danger of becoming impaired because of petitioners' refusal to consent to a blood transfusion. In this regard, respondents failed to carry their burden of proof (Social Services Law § 422 [8] [a]), and, accordingly, the determination denying petitioners' request to expunge must be annulled. It appears to be respondents' contention that a falling blood count necessitated procurement of parental consent to a blood transfusion before the medical necessity therefor became exigent. Thus, the witness from Special Services, explaining why her agency filed a neglect petition with the Family Court when the child's blood count was at the level of 19, testified that her agency was "fearful because the child's blood count was so low". This fear may have been well grounded, but, if so, the record does not show why. Certainly,

no medical evidence was adduced indicating that a drop to the life-threatening level of 16 was inevitable or even likely, or that the child's condition was deteriorating in such a way as to require that the hospital have petitioners' consent in hand while the blood count was as high as 19. Indeed, the only evidence of any kind bearing upon the question of imminence was the investigation report of Special Services' own caseworker, and that was to the effect that further impairment to the child's condition was not imminent until his blood count had fallen to 17. Not until the blood count had fallen to 17 could it be said, on this record, that the child's condition, as a result of petitioners' refusal to give their consent to a blood transfusion, was in imminent danger of becoming more impaired than it already was.

Accepting that Special Services, after interviewing petitioners, had good reason to believe that they were irreversibly opposed to a blood transfusion under any circumstances, prudent hospital management might well have called for taking steps to effect a transfer of custody (see, Social Services Law § 417) well in advance of a drop in the blood count to 16 or 17. The statute, however, defines maltreatment in terms of the child's imminent need for medical care, not the hospital's imminent need to take administrative or legal action authorizing such care if needed at some point in the future. In sum, absent some credible evidence of a present necessity for a blood transfusion, or, for that matter, parental consent thereto, it cannot be said that petitioners failed to provide the child with adequate medical care. To hold otherwise would be to make a determination of maltreatment turn on the perceived inevitability of future neglect.

We note petitioners' present efforts to adopt a foster child, efforts that have been hindered by the indicated report of child maltreatment filed against them in the central register. By expunging the report, we are not to be understood as taking any position on the fitness of persons holding petitioners' religious beliefs against blood transfusions to be adoptive parents. Concur—Murphy, P. J., Ross, Kassal, Wallach and Smith, JJ.